1

2

3

4

5

6

7

8            **IN THE UNITED STATES DISTRICT COURT**

9           **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   CHRISTOPHER JACKSON,                   No. 2:11-CV-3167-TLN-CMK-P

12                  Plaintiff,

13          vs.                             FINDINGS AND RECOMMENDATIONS

14   J. WALKER, et al.,

15                  Defendants.

16   _____/

17          Plaintiff, a prisoner proceeding pro se, brings this civil rights action pursuant to

18   42 U.S.C. § 1983.  Pending before the court is plaintiff's second amended complaint (Doc. 17).

19          The court is required to screen complaints brought by prisoners seeking relief

20   against a governmental entity or officer or employee of a governmental entity.  See 28 U.S.C.

21   § 1915A(a).  The court must dismiss a complaint or portion thereof if it: (1) is frivolous or

22   malicious; (2) fails to state a claim upon which relief can be granted; or (3) seeks monetary relief

23   from a defendant who is immune from such relief.  See 28 U.S.C. § 1915A(b)(1), (2).  Moreover,

24   the Federal Rules of Civil Procedure require that complaints contain a ". . . short and plain

25   statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).

26   This means that claims must be stated simply, concisely, and directly.  See McHenry v. Renne,

84 F.3d 1172, 1177 (9th Cir. 1996) (referring to Fed. R. Civ. P. 8(e)(1)).  These rules are satisfied if the complaint gives the defendant fair notice of the plaintiff's claim and the grounds upon which it rests.  See Kimes v. Stone, 84 F.3d 1121, 1129 (9th Cir. 1996).  Because plaintiff must allege with at least some degree of particularity overt acts by specific defendants which support the claims, vague and conclusory allegations fail to satisfy this standard.  Additionally, it is impossible for the court to conduct the screening required by law when the allegations are vague and conclusory.

## I.  PLAINTIFF'S ALLEGATIONS

This action proceeds on the second amended complaint.  Plaintiff names the following as defendants: (1) T. Brimhall, chief medical officer; (2) Sahota, chief medical officer; (3) Bal, chief medical officer; (4) K. Kelly, chief medical officer; (5) V. Duc, chief medical officer; (6) J. Wedell, physician; (7) Nangalama, physician; (8) Menon, physician; (9) J. Ma, physician; (10) B. Hamkar, physician; (11) Casey, physician; (12) Nancy Dunne, nurse; (13) Amber; (14) Stahl, physical therapist; (15) Thorpe, nurse; (16) Nuevo, nurse; (17) Hartl, correctional officer; (18) Carlson, correctional officer; (19) Robichaud, correctional officer; (20) Donna Figueroa, nurse; (21) Gibson, health care appeals coordinator; (22) A. Briones, health care appeals coordinator; (23) T. Virga, warden; (45) D. Baughman, associate warden; (25) Haring, correctional officer; (26) Blumenshein, correctional officer; (27) Aubert, correctional officer; and (28) K. Rose, correctional officer.  Plaintiff also names the "Medical Authorization Review Committee Members and Health Care Review Members" without specifying whether this refers to individuals other than those specifically named and, if so, who they are.

According to plaintiff, he first complained of knee problems in May 2002 and he was seen on September 12, 2002, by Dr. Turrella.  X-rays were taken on September 18, 2002.  On November 2, 2002, Dr. Turrella reviewed the x-rays with plaintiff.  At that same visit, plaintiff continued to complain of knee pain.  Plaintiff states that Dr. Turrella ordered an outside

1   orthopedic consult based on his findings of loose bodies in both knees.  Plaintiff next states that

2   he was transported to Doctor's Hospital in Manteca on January 13, 2003, for an orthopedic

3   consultation performed by Dr. Williams.  Per Dr. Williams' orders, MRIs were obtained on

4   March 18, 2003, and June 2, 2003.

5            Plaintiff claims that he was seen by defendant Wedell on July 26, 2003, to review

6   the MRIs.  He states that defendant Wedell denied his request to be sent back to Doctor's

7   Hospital for follow-up.  Plaintiff states that he renewed his request on July 30, 3002, and again

8   on August 21, 2003.  According to plaintiff, he was transported back to Doctor's Hospital on

9   November 12, 2003, whereupon he was examined by Dr. Williams.  Plaintiff states that it was

10  Dr. Williams' opinion that surgery was required.   Plaintiff next states that, on March 13, 2004,

11  March 30, 2004, and May 13, 2004, plaintiff was seen by defendant Wedell who acknowledged

12  that plaintiff needed surgery.

13           Plaintiff states that nothing happened until he submitted a CDC-7362 medical

14  request form on September 26, 2004, and he was eventually seen by defendant Duc on October 1,

15  2004.  According to plaintiff, defendant Duc also recommended further treatment, but the

16  recommendation was classified as "routine" which caused further delay.  The request is approved

17  by defendant Dunne on October 13, 2004.

18           Plaintiff claims that, after the October 2004 approval, he saw defendant Duc four

19  times and that defendant Duc "refused to contact Defendant Dunne to confirm date had been set

20  for surgery."  Plaintiff states that he saw defendant Duc again on January 20, 2005, that

21  defendant Duc ordered more MRIs.  According to plaintiff, by this time his mobility was being

22  diminished.

23           Plaintiff was taken back to Doctor's Hospital on February 4, 2005, where he was

24  again seen by Dr. Williams.  Plaintiff states that Dr. Williams was "shocked" that surgery hadn't

25  yet been performed.  Dr. Williams submitted a document reflecting his opinion that surgery

26  needs to be done "ASAP."

1    Plaintiff was again seen at the prison medical clinic by defendant Duc on February

2  23, 2005.  Plaintiff states that, despite going over Dr. Williams' recommendation with defendant

3  Duc, defendant Duc "does not submit CDC 7243 request for services" for plaintiff's surgery.

4  More MRIs are obtained on June 22, 2005, and, at this time, defendant Duc submits a request for

5  medical services form, which is again classified as "routine."  Plaintiff was seen at the clinic

6  again on September 18, 2005, and requested confirmation that his surgery had been approved and

7  scheduled.  Plaintiff is told that it is not and that he will be sent to U.C. Davis Medical Center for

8  further outside consultation.  Plaintiff is told that this was ordered by defendant Dunne.

9    Plaintiff is taken to U.C. Davis Medical Center on January 9, 2006, and seen by

10  Dr. Ryan.  Plaintiff states that, because transport officers neglected to bring his MRI films, Dr.

11  Ryan did not have those to review.  Following an examination of plaintiff, Dr. Ryan

12  recommended physical therapy to strengthen plaintiff's leg muscles.  According to plaintiff, his

13  protests about the missing MRI films and Dr. Williams' recommendations "fell on deaf ears."

14    Plaintiff filed an inmate grievance on January 17, 2006, complaining that Dr.

15  Ryan did not have MRI films to review.  Plaintiff was seen in the medical clinic by defendant

16  Duc on January 26, 2006, who ordered physical therapy.  According to plaintiff, this request was

17  classified as urgent.

18    Defendant Nangalama partially grants plaintiff's inmate appeal on April 13, 2006,

19  and more MRIs are obtained on June 5, 2006.

20    After contacting the "Prison Law Office," which plaintiff states is monitoring

21  medical compliance, plaintiff is told that surgery will be scheduled for late September 2006, per

22  Chief Medical Officer defendant Sahota.  After surgery is not scheduled by this time, plaintiff is

23  told by the Prison Law Office that he now has an appointment for another outside consultation.

24  Plaintiff states that he is taken back to U.C. Davis Medical Center on April 2, 2007, where he is

25  seen by Dr. Douglas.  Plaintiff states that Dr. Douglas did not perform any examination or have

26  MRI films available to review.

1    Plaintiff filed another inmate grievance which was reviewed by defendant

2  Nangalama who ordered additional MRIs and consults.  According to plaintiff, an MRI obtained

3  on September 24, 2007, shows a torn meniscus and joint effusion.

4    Plaintiff states that, by January 2, 2008, his pain was so bad that he was prescribed

5  morphine pain pills.  Plaintiff is seen at the prison medical clinic on January 25, 2008, by

6  defendant Wedell.  According to plaintiff, "Defendant Wedell refuses to grant relief."  Plaintiff is

7  seen in the medical clinic again on April 1, 2008, complaining of "popping, grinding, and

8  crunching" in his knee.  On April 18, 2008, plaintiff is again transported to Doctor's Hospital and

9  examined by Dr. Casey, who opines that plaintiff's condition is not "routine" and that surgery is

10  needed "ASAP."

11    Plaintiff filed another inmate grievance on April 20, 2008, which has reviewed by

12  defendant Gibson.

13    Plaintiff next claims that he met with defendant Menon at the prison medical

14  clinic on May 14, 2008, and that defendant Menon acknowledged the need for surgery but

15  nonetheless failed to submit the paperwork necessary to schedule the surgery.  Plaintiff alleges

16  that, instead, defendant Menon changed plaintiff's pain medications without telling him.

17    Plaintiff states that arthroscopic surgery was eventually performed on October 8,

18  2008.  However, according to plaintiff, due to the long delay in obtaining the surgery, by April

19  2009 he was determined to be partially disabled and a candidate for a total knee replacement.

20  Plaintiff also claims that, due to the delay, by May 2009 he developed misalignment of the spine.

21    Next, plaintiff alleges that defendant Ma failed to adequately respond to a request

22  for medical treatment in May 2009.  More specifically, it appears that plaintiff claims defendant

23  Ma failed to provide medications.  Plaintiff then filed an inmate grievance on June 3, 2009,

24  claiming that defendant Thorpe is responsible for the failure to provide medication.  Plaintiff

25  then claims that defendant Ma then put plaintiff on methadone despite knowing that drug caused

26  negative side effects.  Plaintiff concludes that defendants Ma and Thorpe conspired to put

1  plaintiff on methadone.  According to plaintiff, his June 2009 inmate grievance was heard by

2  defendant Nuevo, who is alleged to also be responsible as a result.

3            Plaintiff underwent knee replacement surgery on January 15, 2010.  According to

4  plaintiff, he was told that he would require post-surgery physical therapy as well as use of a

5  mechanical knee brace for six months.  Plaintiff states that his first meeting with the physical

6  therapist – Defendant Stahl – did not occur for a week following his return to prison and that no

7  therapy was performed at that meeting.   Plaintiff also states that defendant Stahl denied his

8  request for a knee brace.  Plaintiff was seen at Doctor's Hospital on February 1, 2010, at which

9  time it was noted that his physical therapy was behind schedule.  According to plaintiff,

10 defendant Casey refused to contact the prison to instruct that additional therapy was required.  He

11 also claims that defendant Casey refused to intervene regarding the knee brace, or recommend

12 physical therapy outside the prison.

13           Next, plaintiff claims that, despite orders from defendants Ma and Stahl that

14 plaintiff be allowed to use ice twice a day, defendants Hartl, Carlson, and Robichard refused to

15 provide him with ice.  Plaintiff claims that, in the course of the grievance process concerning this

16 issue, defendant Figueroa lied.

17           According to plaintiff, due to substandard physical therapy, he underwent another

18 surgery on March 26, 2010, and was required to begin physical therapy all over again.

19           Next, plaintiff alleges that he has a "verified medical chrono" for a lower bunk

20 due to his disability.  On November 16, 2011, plaintiff was moved to a different cell where his

21 new cellmate, inmate Paschall, occupied the bottom bunk due to his weight (375 pounds).

22 Plaintiff states that, for this reason, he was placed in the top bunk by defendant Haring despite his

23 medical chrono requiring a bottom bunk placement.  Plaintiff adds that defendant Blumenshein,

24 as the floor officer in charge, was aware of his need for a bottom bunk placement but did not

25 provide one.  According to plaintiff, he again requested a lower bunk two days later but

26 defendant Haring denied the request.  Plaintiff was then told that he was officially assigned the

1  bottom bunk of the cell with inmate Paschall.  According to plaintiff, however, inmate Paschall

2  always used the bottom bunk due to his size.  Plaintiff states that defendants Blumenshein,

3  Haring, Rose, Baugham, Virga, Ma, Aubert, and Bal were put on notice of the bunk problem by

4  way of an inmate grievance.  Plaintiff adds that, on December 23, 2011, he was told by defendant

5  Haring that plaintiff "didn't have shit coming cause he filed paperwork on him" and that he

6  should fight with inmate Paschall for the bottom bunk.  Plaintiff states that defendant Ma, whom

7  he had informed of the bunk problem by way of a December 27, 2011, grievance, told him that

8  he didn't want to get involved.

9          Plaintiff states that he eventually found a cell with an open bottom bunk due to an

10  inmate transferring to a different prison.  According to plaintiff, he submitted a "cell move slip"

11  to defendant Aubert, the "floor officer."  Defendant Aubert, however, returned the slip and told

12  plaintiff the cell move would not happen because it was not "cell move day."  Plaintiff next states

13  that, on January 19, 2012, he was interviewed by defendant Rose in his cell, and that Rose saw

14  plaintiff come down from the top bunk.  According to plaintiff, he related the foregoing

15  regarding defendants Aubert and Haring to Rose.  Plaintiff states that, on February 14, 2012, he

16  submitted a "CDCR 22" to defendant Aubert, again requesting to be moved to a cell with an open

17  bottom bunk.  Plaintiff claims that defendant Aubert "never did any move," though plaintiff also

18  states that he was placed in a bottom bunk sometime in late February or early March of 2012.

19          Plaintiff's allegations against each named defendant are summarized as follows:

| | |
|---|---|
| 20  T. Brimhall, chief medical officer | Liable as the chief medical officer responsible for |
| 21 | development and implementation of medical care standards. |
| 22  Sahota, chief medical officer | Ordered surgery to be scheduled for late September |
| 23 | 2006. |
| | Bal, chief medical officer | Put on notice of the bunk problem by way of an |
| 24 | inmate grievance. |
| 25  K. Kelly, chief medical officer | Liable due to his supervisory role. |

26  ///

7

| | | |
|---|---|---|
| 1<br>2<br>3 | V. Duc, chief medical officer | Saw plaintiff on October 1, 2004, in response to a medical request form submitted on September 26, 2004; caused delay by classifying further treatment as "routine," though treatment recommendation was approved on October 13, 2004, by defendant Dunne. |
| 4<br>5<br>6 | | Saw plaintiff five times between October 2004 and January 2005; ordered additional MRI testing; " "refused to contact Defendant Dunne to confirm date had been set for surgery." |
| 7<br>8 | | Saw plaintiff on February 23, 2005, but "does not submit CDC 7243 request for services" for surgery; submits request for medical services form on June 22, 2005, which is again classified as "routine." |
| 9<br>10 | | Saw plaintiff on January 26, 2006, and ordered physical therapy on an "urgent" basis. |
| 11<br>12 | J. Wedell, physician | Denied plaintiff's request to be sent back to Doctor's Hospital for follow-up despite acknowledging that plaintiff needed surgery. |
| 13 | | Saw plaintiff on January 25, 2008, but "Defendant Wedell refuses to grant relief." |
| 14<br>15 | Nangalama, physician | Partially grants plaintiff's inmate appeal on April 13, 2006, after which additional MRIs are obtained on June 5, 2006. |
| 16<br>17<br>18 | Menon, physician | Saw plaintiff  on May 14, 2008, and acknowledged that plaintiff needed surgery but nonetheless failed to submit the paperwork necessary to schedule the surgery; instead, Menon changed plaintiff's pain medications without telling him. |
| 19<br>20 | J. Ma, physician | Failed to adequately respond to a request for medical treatment in May 2009; plaintiff appears to claim that Ma should have provided medication. |
| 21<br>22<br>23 | | Put plaintiff on methadone despite knowing that drug caused negative side effects; plaintiff concludes that defendants Ma and Thorpe conspired to put plaintiff on methadone. |
| 24<br>25 | | Informed of the bunk problem by way of a December 27, 2011, grievance, but told plaintiff that he didn't want to get involved. |
| 26 | B. Hamkar, physician | Liable due to supervisory responsibilities. |

| | |
|---|---|
| Casey, physician | Refused to contact the prison to instruct that additional therapy was required; refused to intervene regarding the knee brace, or recommend physical therapy outside the prison. |
| Nancy Dunne, nurse | Approved defendant Duc's recommendation for further treatment on October 13, 2004; ordered plaintiff sent to U.C. Davis Medical Center for further outside consultation. |
| Amber | Responsible for arranging appointments with outside medical providers. |
| Stahl, physical therapist | Denied plaintiff's request for a knee brace. |
| Thorpe, nurse | Failed to provide medication; plaintiff concludes that defendants Ma and Thorpe conspired to put plaintiff on methadone. |
| Nuevo, nurse | Reviewed plaintiff's inmate grievance. |
| Hartl, correctional officer | Refused to provide plaintiff with ice. |
| Carlson, correctional officer | Refused to provide plaintiff with ice. |
| Robichaud, correctional officer | Refused to provide plaintiff with ice. |
| Donna Figueroa, nurse | Lied during course of processing plaintiff's inmate grievance. |
| Gibson, appeals coordinator | Reviewed plaintiff's inmate grievance. |
| A. Briones, appeals coordinator | Responsible for processing inmate grievances. |
| T. Virga, warden | Put on notice of the bunk problem by way of an inmate grievance. |
| D. Baughman, associate warden | Put on notice of the bunk problem by way of an inmate grievance. |
| Haring, correctional officer | Assigned plaintiff a top bunk despite his medical chrono requiring a bottom bunk placement; denied request for bottom bunk; told plaintiff he "didn't have shit coming cause he filed paperwork on him" and that he should fight with his cellmate for the bottom bunk. |
| Blumenshein, correctional officer | Plaintiff adds that defendant Blumenshein, as the floor officer in charge, was aware of his need for a bottom bunk placement but did not provide one. |

| | |
|---|---|
| Aubert, correctional officer | Told plaintiff a cell move would not happen because it was not "cell move day." |
| K. Rose, correctional officer | Informed by plaintiff of bunk assignment issue. |

Plaintiff alleges that following claims for relief: (1) deliberate indifference to his medical needs in violation of the Eighth Amendment; (2) violation of due process under the Fourteenth Amendment; (3) negligence; (4) intentional infliction of emotional distress; and (5) "torts in essence."

## II.  DISCUSSION

The second amended complaint suffers from a number of defects, each discussed below.

### A.  <u>Supervisory Defendants</u>

Supervisory personnel are generally not liable under § 1983 for the actions of their employees. <u>See</u> <u>Taylor v. List</u>, 880 F.2d 1040, 1045 (9th Cir. 1989) (holding that there is no respondeat superior liability under § 1983).  A supervisor is only liable for the constitutional violations of subordinates if the supervisor participated in or directed the violations.  <u>See</u> <u>id.</u>  The Supreme Court has rejected the notion that a supervisory defendant can be liable based on knowledge and acquiescence in a subordinate's unconstitutional conduct because government officials, regardless of their title, can only be held liable under § 1983 for his or her own conduct and not the conduct of others.  <u>See</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009). Supervisory personnel who implement a policy so deficient that the policy itself is a repudiation of constitutional rights and the moving force behind a constitutional violation may, however, be liable even where such personnel do not overtly participate in the offensive act.  <u>See</u> <u>Redman v. Cnty of San Diego</u>, 942 F.2d 1435, 1446 (9th Cir. 1991) (en banc).

/ / /

/ / /

1    When a defendant holds a supervisory position, the causal link between such

2    defendant and the claimed constitutional violation must be specifically alleged.  See Fayle v.

3    Stapley, 607 F.2d 858, 862 (9th Cir. 1979); Mosher v. Saalfeld, 589 F.2d 438, 441 (9th Cir.

4    1978).  Vague and conclusory allegations concerning the involvement of supervisory personnel

5    in civil rights violations are not sufficient.  See Ivey v. Board of Regents, 673 F.2d 266, 268 (9th

6    Cir. 1982).  "[A] plaintiff must plead that each Government-official defendant, through the

7    official's own individual actions, has violated the constitution." Iqbal, 129 S.Ct. at 1948.

8    Plaintiff names the following supervisory personnel:  T. Brimhall, chief medical

9    officer; Sahota, chief medical officer; Bal, chief medical officer; K. Kelly, chief medical officer;

10   V. Duc, chief medical officer; T. Virga, warden; D. Baughman, associate warden; and B.

11   Hamkar, physician.  As to Brimhall and Kelly, plaintiff alleges that they are liable as chief

12   medical officers responsible for subordinates.  Plaintiff alleges that Hamkar is liable due to

13   supervisory responsibilities.  Plaintiff has not alleged facts to show how these defendants

14   personally participated in any alleged constitutional violations.  As to defendants Bal, Virga, and

15   Baughman, plaintiff alleges that they were put on notice by way of various inmate grievances.

16   Again, such allegations are insufficient without specific facts showing how each defendant

17   personally participated in alleged violations.  Finally, as to defendants Sahota and Duc, plaintiff's

18   allegations indicate that they provided medical care to plaintiff.  Specifically, plaintiff states that

19   Sahota ordered surgery.  Similarly, plaintiff alleges that defendant Duc treated plaintiff on

20   numerous occasions, ordered additional testing, and approved surgery and physical therapy.

21       **B.**   **Grievance Process**

22   Plaintiff names a number of defendants who were involved with the inmate

23   grievance process.  Specifically, plaintiff claims that Nangalama reviewed his inmate grievance

24   in April 2006 and ordered additional MRI tests.  Plaintiff alleges that defendant Ma was

25   informed of plaintiff's bunk problem by way of a December 2011 grievance.  Plaintiff alleges

26   that Nuevo and Figueroa, prison nurses, reviewed his inmate grievances.  Plaintiff asserts that

1    Gibson, the appeals coordinator, reviewed his grievances and that Briones, also an appeals

2    coordinator, is responsible for inmate grievances.

3         Prisoners have no stand-alone due process rights related to the administrative

4    grievance process.  See Mann v. Adams, 855 F.2d 639, 640 (9th Cir. 1988); see also Ramirez v.

5    Galaza, 334 F.3d 850, 860 (9th Cir. 2003) (holding that there is no liberty interest entitling

6    inmates to a specific grievance process).  Because there is no right to any particular grievance

7    process, it is impossible for due process to have been violated by ignoring or failing to properly

8    process grievances.   Numerous district courts in this circuit have reached the same conclusion.

9    See Smith v. Calderon, 1999 WL 1051947 (N.D. Cal 1999) (finding that failure to properly

10   process grievances did not violate any constitutional right); Cage v. Cambra, 1996 WL 506863

11   (N.D. Cal. 1996) (concluding that prison officials' failure to properly process and address

12   grievances does not support constitutional claim); James v. U.S. Marshal's Service, 1995 WL

13   29580 (N.D. Cal. 1995) (dismissing complaint without leave to amend because failure to process

14   a grievance did not implicate a protected liberty interest); Murray v. Marshall, 1994 WL 245967

15   (N.D. Cal. 1994) (concluding that prisoner's claim that grievance process failed to function

16   properly failed to state a claim under § 1983.  Prisoners do, however, retain a First Amendment

17   right to petition the government through the prison grievance process.  See Bradley v. Hall, 64

18   F.3d 1276, 1279 (9th Cir. 1995).  Therefore, interference with the grievance process may, in

19   certain circumstances, implicate the First Amendment.

20        In this case, plaintiff has not alleged interference with the grievance process by

21   any defendant and plaintiff's contention that certain defendants were involved with his various

22   inmate grievances is insufficient to state a claim.

23   / / /

24   / / /

25   / / /

26   / / /

C.    **Remaining Defendants**

As to the remaining defendants, plaintiff's claims relate to medical care.  The treatment a prisoner receives in prison and the conditions under which the prisoner is confined are subject to scrutiny under the Eighth Amendment, which prohibits cruel and unusual punishment.  See Helling v. McKinney, 509 U.S. 25, 31 (1993); Farmer v. Brennan, 511 U.S. 825, 832 (1994).  The Eighth Amendment ". . . embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency."  Estelle v. Gamble, 429 U.S. 97, 102 (1976).  Conditions of confinement may, however, be harsh and restrictive.  See Rhodes v. Chapman, 452 U.S. 337, 347 (1981).  Nonetheless, prison officials must provide prisoners with "food, clothing, shelter, sanitation, medical care, and personal safety."  Toussaint v. McCarthy, 801 F.2d 1080, 1107 (9th Cir. 1986).  A prison official violates the Eighth Amendment only when two requirements are met: (1) objectively, the official's act or omission must be so serious such that it results in the denial of the minimal civilized measure of life's necessities; and (2) subjectively, the prison official must have acted unnecessarily and wantonly for the purpose of inflicting harm.  See Farmer, 511 U.S. at 834.  Thus, to violate the Eighth Amendment, a prison official must have a "sufficiently culpable mind."  See id.

Deliberate indifference to a prisoner's serious illness or injury, or risks of serious injury or illness, gives rise to a claim under the Eighth Amendment.  See Estelle, 429 U.S. at 105; see also Farmer, 511 U.S. at 837.  This applies to physical as well as dental and mental health needs.  See Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982).  An injury or illness is sufficiently serious if the failure to treat a prisoner's condition could result in further significant injury or the ". . . unnecessary and wanton infliction of pain."  McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992); see also Doty v. County of Lassen, 37 F.3d 540, 546 (9th Cir. 1994).  Factors indicating seriousness are: (1) whether a reasonable doctor would think that the condition is worthy of comment; (2) whether the condition significantly impacts the prisoner's daily activities; and (3) whether the condition is chronic and accompanied by substantial pain.  See

1  Lopez v. Smith, 203 F.3d 1122, 1131-32 (9th Cir. 2000) (en banc).

2        The requirement of deliberate indifference is less stringent in medical needs cases

3  than in other Eighth Amendment contexts because the responsibility to provide inmates with

4  medical care does not generally conflict with competing penological concerns.  See McGuckin,

5  974 F.2d at 1060.  Thus, deference need not be given to the judgment of prison officials as to

6  decisions concerning medical needs.  See Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir.

7  1989).  The complete denial of medical attention may constitute deliberate indifference.  See

8  Toussaint v. McCarthy, 801 F.2d 1080, 1111 (9th Cir. 1986).  Delay in providing medical

9  treatment, or interference with medical treatment, may also constitute deliberate indifference.

10  See Lopez, 203 F.3d at 1131.  Where delay is alleged, however, the prisoner must also

11  demonstrate that the delay led to further injury.  See McGuckin, 974 F.2d at 1060.

12        Negligence in diagnosing or treating a medical condition does not, however, give

13  rise to a claim under the Eighth Amendment.  See Estelle, 429 U.S. at 106.  Moreover, a

14  difference of opinion between the prisoner and medical providers concerning the appropriate

15  course of treatment does not give rise to an Eighth Amendment claim.  See Jackson v. McIntosh,

16  90 F.3d 330, 332 (9th Cir. 1996).

17        Plaintiff's allegations concerning medical care are insufficient.  Specifically, they

18  point to a difference of medical opinion and/or alleged medical negligence.  Plaintiff's

19  allegations do not indicate deliberate indifference.  To the contrary, on numerous occasions

20  plaintiff alleges that he was indeed provided treatment, albeit treatment with which he did not

21  necessarily agree.

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

### III.  CONCLUSION

Because it does not appear possible that the deficiencies identified herein can be cured by amending the complaint, plaintiff is not entitled to leave to amend prior to dismissal of the entire action.  See Lopez v. Smith, 203 F.3d 1122, 1126, 1131 (9th Cir. 2000) (en banc).

Based on the foregoing, the undersigned recommends that this action be dismissed for failure to state a claim.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days after being served with these findings and recommendations, any party may file written objections with the court.  Responses to objections shall be filed within 14 days after service of objections.  Failure to file objections within the specified time may waive the right to appeal. See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).


 DATED:  January 10, 2017


                                   _____
                                   **CRAIG M. KELLISON**
                                   UNITED STATES MAGISTRATE JUDGE